IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| LORA L. MILETTA, | ) | CV 04-1133-HU |
| | ) | |
| Plaintiff, | ) | |
| | ) | FINDING AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

ALAN STUART GRAF
KIMBERLY K. TUCKER
1020 SW Taylor Street, Ste 230
Portland Oregon 97205
        Attorneys for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

RICHARD M. RODRIGUEZ
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Ste 2900 M/S 901
Seattle Washington 98104
        Attorneys for Defendant

HUBEL, Magistrate Judge:

Plaintiff Lora Miletta brings this action for judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance benefits (DIB) under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). The Commissioner's final decision should be affirmed.

Miletta also seeks judicial review of the Commissioner's refusal to reopen a prior application for DIB. The court lacks jurisdiction over that claim and it should be dismissed.

## BACKGROUND

Miletta was born April 2, 1960. She did not require special education and completed high school and one year of college. She worked as a laundry worker, packer, fast food worker, cashier/checker, security officer and janitor. She had steady sustained employment until she experienced a work related low-back strain in July 1997. While off work for that injury, she began to experience unrelated diffuse body pain, numbness and tingling. Miletta's employer went out of business before she returned from medical leave.

Miletta alleges that she became disabled on October 1, 1997, due to polymyalgia and fibromyalgia. She alleges that she cannot stand, sit, lift or bend for long periods of time. She gets tired very quickly and "all [her] body hurts." Tr. 279.[1]

---

[1]Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

# DISABILITY ANALYSIS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). *See also* 20 C.F.R. § 404.1520. Miletta challenges the ALJ's evaluation of the evidence and findings at steps two and five of the sequential process.

At step two of the sequential process, the Commissioner will find the claimant not disabled if the ALJ determines that the claimant has no "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 404.1520(c).

At step two in this case, the ALJ identified a combination of medically determinable impairments which satisfied the regulatory definition of "severe" because it significantly limited Miletta's ability to perform basic work activities. He described the combination of impairments as follows:

> The medical evidence indicates that the claimant has diffuse mild degenerative orthopedic changes, fibromyalgia, seizure-like symptoms of unclear etiology, panic disorder without agoraphobia, and possible borderline intellectual functioning.

Tr. 22.

For the purposes of step five of the sequential process, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by her impairments. 20 C.F.R. § 404.1545(a); Social Security Ruling (SSR) 96-8p.

In this case, the ALJ assessed Miletta's RFC as follows:

> The claimant is found to have the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently. She is able to sit, stand and walk without restrictions, except she must be afforded the opportunity to change positions frequently (but not at will or constantly). The pattern of "seizure" symptoms actually documented appears to have minimal impact on the claimant's functioning, particularly since she began taking antianxiety medication. However, erring on the side of caution it is accepted that she must avoid working at unprotected heights, or in other hazardous situations. Similarly, while Ms. Miletta might have certain cognitive limitations related to borderline intelligence, her capacity to perform simple, repetitive, one and two step operations is not significantly impaired. This limitation contemplates a person that is not significantly impaired regarding her ability to perform the mental demands of unskilled work.

Tr. 26.

If the adjudication reaches step five, the Commissioner must determine whether the claimant can perform work that exists in the national economy. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. § 404.1520(e), (f). Here the burden shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Yuckert*, 482 U.S. at 141-42; *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. § 404.1566.

At step five in this case, the ALJ found that Miletta's RFC left her able to work at a significant number of jobs in the national economy. He identified three examples of such work, drawn from the testimony of the impartial vocational expert (VE): ticket seller, gate guard and cashier. The ALJ concluded that Miletta was not disabled nor entitled to benefits.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence and resolving ambiguities. *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001). If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson*, 359 F.3d at 1193. The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation." *Andrews*, 53 F.3d at 1039-40.

## DISCUSSION

Miletta contends the ALJ erred at step two by failing to identify all of the medically determinable impairments that significantly limit her ability to perform work-related activities. She contends the ALJ failed to accurately assess her RFC because he improperly discredited her subjective statements and discounted the opinion of one of her treating physicians. She contends the ALJ erred at step five because he relied on inadequate vocational testimony. Finally, Miletta argues that the ALJ should have reopened her prior claim.

## I.    Severe Impairments

Miletta contends that the ALJ erred by failing to find that polymyalgia rheumatica, dissociative identity disorder and personality disorder are "severe" for the purposes of step two. Miletta's argument fails because the ALJ did not decide her claim at step two of the sequential process.  The inquiry at step two is a *de minimis* screening tool to dispose of groundless claims. *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  If the claimant has no severe impairments, the Commissioner will find her "not disabled" without continuing to the remaining steps of the sequential process.  20 C.F.R. § 404.1520(c); SSR 85-28.  The ALJ found that Miletta presented sufficient evidence of severe impairments to surmount the *de minimis* screening tool and continued through the remaining steps of the sequential process until he reached a conclusion at step five.

In addition, Miletta failed to show that the three conditions cause significant functional limitations.  It is the claimant's burden to show that her impairment is severe.  *Edlund v. Massinari,* 253 F.3d at 1159-60.  An impairment is severe if it significantly limits the claimant's ability to do basic work activities.  These include physical functions, such as walking, standing and sitting, and mental functions, such as understanding, remembering, using judgment and responding appropriately to work situations.    20 C.F.R. § 404.1521.

Miletta received a diagnosis of "probable polymyalgia rheumatica" at her initial visit with Robert T. Burke, M.D., in November 1997.  Tr. 158.  Dr. Burke based this diagnosis on her description of migrating diffuse muscle pain and history of chronically elevated erythrocyte sedimentation rates.  He noted some diagnostic uncertainty whether her diffuse muscle pain would be more accurately described as a fibromyalgia syndrome or polymyalgia rheumatica.  Dr. Burke described polymyalgia rheumatica as a condition with "fibromyalgia like symptoms."  Tr. 386.  It

was "hard for [Miletta] to distinguish between the symptoms attributed to the polymyalgia rheumatica versus osteoarthritis versus fibromyalgia." Tr. 346.

It appears from the record as a whole, that each of these conditions produced the same symptoms of diffuse musculoskeletal pain and the functional limitations that reasonably follow from such pain. The ALJ considered all the evidence of functional limitations reasonably attributed to musculoskeletal pain and restricted Miletta's RFC to accommodate her limited lifting ability and her need to change positions frequently.

Miletta has not identified any functional limitations imposed by polymyalgia rheumatica that were not also attributable to fibromyalgia. The ALJ accepted that Miletta has diffuse body pain that limits her ability to lift and requires her to change positions frequently. Tr. 26. Miletta has failed to support her burden of proving polymyalgia rheumatica imposes additional limitations. Accordingly, any error in the ALJ's failure to list polymyalgia rheumatica separately among the severe impairments he found at step two was harmless.

Miletta failed to demonstrate any functional limitations from a dissociative disorder. David Verburg, M.D., performed a psychiatric evaluation for pseudo-seizures in January 2001. During the intake interview, Miletta reported that she has heard voices in her head since childhood. Her counselor noted the need to rule out dissociative disorder as a possible diagnosis. Dr. Verburg found that Miletta "appeared to realize that the voices were much more in her head, not classic auditory hallucinations." Tr. 482. He found no clear cut symptoms of major depression, mania or obsessive-compulsive disorder. Miletta's memory was intact and she demonstrated average intelligence. Her thought processes and thought content were intact and she denied depression or anxiety.

Miletta failed to identify any evidence in the medical records that would support a finding that she has limitations in the mental functions required for basic work activities due to dissociative disorder. The ALJ properly excluded this diagnosis from the severe impairments identified at step two.

Similarly, Miletta failed to demonstrate any functional limitations from a personality disorder. Dr. Verburg found that she did not have symptoms of obsessive-compulsive personality disorder and did not note symptoms of any other type of personality disorder. After a psychodiagnostic examination in November 2000, Jerome Gordon, Ph.D., found that she had histrionic personality features, but did not diagnose a personality disorder. He made no findings of any functional limitation due to a personality disorder.

Miletta failed to present any basis from which the ALJ could conclude that she is severely impaired by a personality disorder. The ALJ's exclusion of that diagnosis from the severe impairments listed at step two was not erroneous.

## II.    RFC Assessment

### A.    Miletta's Credibility

Miletta testified that she cannot work because fibromyalgia and polymyalgia rheumatica leave her very tired and make her body hurt all the time in one place or another. Her fatigue is brought on by physical activity. She has numbness, tingling and burning pain in her hands, elbows and feet almost all the time. She also gets pain in her shoulders, knees and ankles. Sometimes she gets a sharp pain from her arms all the way down her legs. Sometimes her hands give out and she drops things. She cannot squeeze objects. If she holds an object for very long, her hands tingle and become numb.

Miletta testified that she has difficulty sitting, standing and moving around at different times, depending on which part of her body hurts. She is able to lift 10 to 20 pounds. She can walk up to three blocks when it is cold and about one mile when it is warm. She can stand in one spot for about 45 minutes before she begins to feel numbness, tingling and aching in the legs and the sensation that her knees are about to buckle. She can sit for 30 to 45 minutes before her low back begins to ache and she must stand and shake her legs or move around. She loses her breath and has chest pain when climbing stairs.

In addition, Miletta testified that she experiences seizure-like episodes every three to ten days. Most of the episodes involve nausea and lightheadedness with occasional shaking or twitching. If she lies down briefly, she can stop the symptoms. She does not lose consciousness or the ability to communicate. About once every other month, she has a more severe episode involving up to 15 minutes of involuntary twitching followed by extreme exhaustion and the need to sleep for 10 to 12 hours.

Miletta testified that she has no difficulty getting along with neighbors, her landlord or others in the general public. Her psychological counselor has said that her seizure episodes resemble panic attacks, and Miletta apparently agrees with that assessment. She reads and spells poorly and has difficulty with arithmetic. She does not keep her own checkbook, but can make change.

Miletta testified that her daily activities include watching television, reading and playing with her grandchildren. She watches her grandchildren for brief periods when her daughter needs to run an errand. She tries to walk for fitness and performs basic exercises, such as sit-ups. She must take rest breaks to complete her daily household chores. She takes a nap in the afternoon approximately every other day for about 60 to 90 minutes. She went camping on a retreat with her church. She

goes fishing, but makes sure that she does so where she is able to sit or stand or move around as necessary.

The ALJ found that Miletta's testimony had limited credibility. He believed her statements to the extent they were consistent with his RFC assessment and discredited them to the extent they suggested greater functional limitations. Miletta's testimony regarding her sitting, standing and walking limitations is consistent with the ALJ's RFC restriction that she must be afforded the opportunity to change positions frequently. Her allegation that pain and fatigue render her completely unable to work is inconsistent with the RFC assessment, as is the implication in her testimony regarding seizure-like episodes that they require her to lie down and rest frequently.

The ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F3d at 1284. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties with personal knowledge about the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p.

The ALJ considered appropriate factors and his reasons are supported by substantial evidence in the record as a whole. The ALJ reviewed the objective evidence and clinical findings and found that they did not support Miletta's testimony that she is unable to work. For the most part Miletta's

musculoskeletal condition did not cause a great deal of limitation on range of motion tests. Tr. 162, 165, 189, 198, 200, 204, 209, 210, 211, 212, 220, 371, 384, 386. This was not uniform (Tr. 194, 348), but sufficiently consistent to support the ALJ's findings. Miletta could ambulate normally and her muscle tone and strength were good. Tr. 144, 173, 181, 194, 363, 384, 422. Neurological examinations consistently produced grossly normal results. 165, 173, 348-49, 363, 418, 422.

Objective tests for inflammatory autoimmune diseases, including anti-nuclear antibody screens, rheumatoid factor and serum protein electrophoresis tests were negative. Tr. 167, 386. Miletta has demonstrated a chronically elevated erythrocyte sedimentation rate, which was the basis of her polymyalgia rheumatica diagnosis. Tr. 166, 174, 386, 405, 407. Miletta's work history shows that this condition does not produce disabling symptoms. Her sedimentation rate has been elevated since at least 1993, yet she worked without limitation until July 1997. When she stopped working, it was not due to polymyalgia rheumatica, but because of a completely unrelated low-back strain. The diffuse musculoskeletal pain and fatigue that are the basis of her present claim did not begin until after that injury. Thus the elevated sedimentation rate does not correlate with her most debilitating symptoms.

Miletta underwent a physical capacities evaluation on May 22, 2000. She demonstrated the ability to do light work, and the occupational therapist projected that she would be able to work a full 8-hour shift. Tr. 383-85. The therapist cautioned that she should avoid situations requiring high productivity and would need work "in which alternating standing and sitting is an option." Tr. 385. Within these constraints, the occupational therapist believed Miletta could perform full time work. *Id.*

Miletta underwent outpatient neurology consultations for her seizure-like experiences. Tr. 362-63, 422-23. The episodes she described were not typical seizures and her neurology examinations were normal. She had a history of normal CT and EEG studies and one very slightly abnormal EEG that was "not diagnostic" and showed "no evidence of epileptiform discharges." Tr. 422. All clinical findings were normal, except that Miletta demonstrated histrionic "bizarre pursuit patterns" in her eye movements. *Id.*

Miletta underwent a tilt table study for vasovagal syncope in November 2000. She experienced a spell that was typical of what she has described as seizures during the examination, but all objective measures remained within normal limits and she was awake, conversant and able to follow instructions and describe her sensations. This was interpreted as a negative examination that ruled out neurocardiogenic syncope and any cardiac component to her spells. Tr. 464-68.

Miletta then underwent the psychodiagnostic examinations mentioned in the preceding section. Dr. Gordon opined that her description of seizures was consistent with panic attacks "although she does appear to be comparatively undistressed by them." Tr. 442-43. He believed she had attention and concentration difficulties and below average intelligence, but these dated from childhood. Her completion of high school without special education services and a year of college as well as her work history show that these limitations do not preclude the mental functions required for basic work activities. Similarly, Dr. Verburg's examination resulted in moderate findings that did not suggest complete disability.

In addition to the objective medical evidence, the ALJ relied on medical source opinion statements that Miletta remained capable of performing basic work. For example, in October 1997, Paul Jacobs, M.D., performed an evaluation for fibromyalgia syndrome. Tr. 165-66. On

examination, Miletta had universal trigger point tenderness and an elevated erythrocyte sedimentation rate. Tr. 165. Dr. Jacobs suspected a fibromyalgia syndrome, but indicated that modified work duty restrictions were not required. Tr. 164, 166.

In November 1997, Miletta's primary care physician, Robert T. Burke, M.D., opined that she could work up to 16-hour shifts if she could be retrained for sedentary work. Tr. 456. The ALJ differed with the sedentary limitation, but the conclusion that she could perform basic work activities for greater than a full-time shift contradicts Miletta's assertion that fatigue prevents her from working full time. Dr. Burke's later statements that Miletta was unable to work relied significantly on his assumption that she lacked the mental capacity to learn a new job. Dr. Burke's full opinion is discussed further in the following section.

The ALJ also relied on the findings of state agency medical experts who reviewed Miletta's entire medical file and concluded that she remained capable of the exertion required for light work and the mental functions required for basic work activities. Tr. 142-47, 213-20, 350-57, 444-60.

As noted, Miletta's work history and educational accomplishments provide a reasonable basis to conclude that long-standing limitations including intellectual deficits, difficulties with concentration and attention, alleged dissociative symptoms and functional limitations related to her chronically elevated sedimentation rate do not impose disabling symptoms.

The ALJ found Miletta's reported activities inconsistent with her claim that she cannot work. Miletta lives independently and performs personal grooming and hygiene as well as household chores without assistance. She goes fishing and camping, does gardening, needlepoint and arts and crafts. She reads and watches television, dines out and goes to the movies. She babysits her

grandchildren frequently. While these activities are not equivalent to sustained full time work, they suggest a functional level that exceeds Miletta's assertions of disabling pain and fatigue. The ALJ could reasonably conclude that a person suffering from incapacitating pain and fatigue would avoid this level of activity.

Furthermore, Miletta reported to her treating sources that her pain improved and her activity level increased with treatment. For example, in February 1998, Miletta told Dr. Burke that her symptoms improved after starting a tricyclic antidepressant medication with occasional Motrin for pain. In February and April 1999, she told him her pain "was in good control so that ADLs are not a problem." Tr. 221, 369.

The ALJ found that Miletta overstated the severity of the seizure-like spells she experiences. Miletta testified that once every other month she has a spell that is so severe that she must sleep for up to 12 hours. The ALJ pointed out that extensive evaluation failed to reveal any neuropathy or neurocardiogenic basis for these episodes. Nor does she have typical seizure symptoms. She does not lose consciousness or motor control, but remains fully conversant with reasoning intact. Tr. 363, 416, 417, 467. Her blood pressure and heart rate remain within normal limits during these episodes and the only outward indication is brief involuntary shaking, primarily in the upper extremities. Tr. 466-67. Miletta's assertion that such episodes often leave her exhausted and require up to 12 hours of sleep does not appear to be reasonable on the record as a whole.

In addition, Miletta overstated the frequency of these episodes, particularly after she began treatment for anxiety. She testified that the spells occur every three to ten days. On January 31, 2001, Dr. Verburg started her on Zoloft for anxiety. Tr. 482-83. On February 28, 2001, she reported no seizures in the interim. Tr. 476. Based on Dr. Gordon's opinion that her symptoms resembled

panic attacks and her favorable response to anti-anxiety medication, her spells appear adequately controlled. The ALJ reasonably concluded that with proper treatment these symptoms did not impose a pattern of frequent incapacity that would significantly affect her ability to engage in sustained work activity.

The ALJ also found that Miletta made statements that appeared to be less than candid. For example, she told Dr. Burke and others that she had been denied vocational rehabilitation services because she did not have the mental capacity to be retrained. On January 7, 2000, Dr. Burke noted "She tells me that voc rehab refused her desire for training in a sedentary job because her reading was so low that they did not feel she could be retrained." Tr. 388. However, her vocational rehabilitation notes indicate that her treatment was terminated for "Failure to Cooperate." Tr. 277. The case narrative states that Miletta "would rather do some fishing" with a new boat and would call in the future if she needed services. *Id.*

Miletta contacted her vocational rehabilitation counselor several months later, for assistance finding a part-time, sedentary occupation. She indicated that she continued to receive monthly long-term disability pay from her former employer's insurer. The counselor expressed doubt the she could find work "in which she would make as much as she is receiving from disability." Tr. 340. Miletta did not pursue vocational rehabilitation further. Accordingly, her statement that services had been terminated because she lacked the mental capacity to be retrained was false.

Based on the foregoing, the ALJ articulated clear and convincing reasons supported by substantial evidence in the record for discrediting Miletta's assertion that her pain, fatigue, seizure symptoms and other conditions cause limitations that are so severe that she cannot work. Accordingly, the court should sustain the ALJ's credibility determination.

**B.** **Medical Source Statement of Dr. Burke**

Miletta contends the ALJ improperly rejected the opinion of Dr. Burke. Dr. Burke became Miletta's primary care clinician after her work injury in July 1997. He diagnosed probable polymyalgia rheumatica in November 1997 based on her elevated erythrocyte sedimentation rate and subjective complaints of migrating pain in all muscle groups. He saw Miletta at irregular intervals ranging from two weeks to nine months through at least January 2001.

Dr. Burke made several statements regarding Miletta's ability to work. On November 10, 1997, he noted that "she is unable to do all her ADL's and therefore will not be able to work at any job that is not a sit-down job." Tr. 158. He did not make any findings of specific functional limitations and apparently relied on her subjective report of limitations in activities of daily living. On November 24, 1997, he prepared a Physical Assessment Form for placing Miletta upon her anticipated return to work from her work injury earlier that year. He indicated that Miletta could lift up to 10 pounds frequently and work up to 16 hours a day at a "sit-down job." Tr. 156.

In February 1998, Dr. Burke noted that Miletta was much improved after stabilizing on tricyclic Amitriptyline and occasional Motrin. His only clinical observation was that "exam shows gait normal." Tr. 150. In February and April 1999, Miletta reported "pain is in good control so that ADL's are not a problem." Tr. 221, 369. In the midst of these indications of improvement, Dr. Burke indicated on May 1, 1998, without further explanation "the above named PT has polymyalgia rheumatica and will be able to work only 4.5 hrs per day in 1 location." Tr. 392.

In November 1999, Dr. Burke provided a work excuse stating "the above named patient has polymyalgia rheumatica and will be unable to work with any reasonable continuity the material duties of any gainful occupation for which she is reasonably fitted by education, training and

experience." Tr. 365, 391. On January 7, 2000, Dr. Burke opined that "PT is unable to work as a laborer secondary to her severe osteoarthritis and her muscle disorder." Tr. 388-90. He did not report any abnormal findings on examination.

On May 15, 2000, Dr. Burke wrote to Miletta's counsel indicating that "continued problems with osteoarthritis and fibromyalgia along with polymyalgia rheumatica continue to leave the patient unable to perform any kind of consistent work." Tr. 387.

The ALJ can reject the opinion of a treating or examining physician that is inconsistent with the opinions of other treating or examining physicians, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ may reject a physician's disability opinion that is premised on the claimant's subjective symptom reports which the ALJ has already properly discredited. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

The ALJ did not credit Dr. Burke's opinion that Miletta is limited to sedentary work because there was no indication in the record that he was aware of the specific functional limitations of that vocational category as it is defined in the regulations that governed the ALJ's decision. Dr. Burke's medical expertise did not extend to such vocational issues.

Dr. Burke did not make findings regarding Miletta's functional limitations that would be necessary to determine that she is limited to sedentary work. The incomplete findings indicated on the November 1997 Physical Assessment Form do not clearly limit her to sedentary work. Furthermore, those findings do not appear to be based on any sort of measurement of her physical

capacity. Indeed, Dr. Burke did not perform a physical capacities evaluation of any kind. As already described, the objective and clinical findings other than her chronically elevated erythrocyte sedimentation rate were grossly normal.

Under these circumstances, it is reasonable to conclude that Dr. Burke's opinion of Miletta's functional limitations was based primarily on her subjective description of her limitations. For all the reasons described above, her subjective reporting was properly found to lack credibility. These circumstances also make it reasonable for the ALJ to place greater weight on the physical capacities evaluation administered on May 22, 2000, by occupational therapist Susan Gallagher. During that examination, Miletta demonstrated that she could perform a significant range of light work. This was consistent with the opinions of the state agency medical experts who reviewed the entire medical record and concluded that Miletta could perform light work.

The ALJ also discredited Dr. Burke's opinion that Miletta's condition was worsening. The medical record does not demonstrate any significant measurable change to support Dr. Burke's conclusion. An ALJ is entitled to reject a medical opinion that is brief, conclusory and inadequately supported by clinical findings. *Thomas*, 278 F.3d at 957. In addition, an ALJ may reject a medical opinion that is premised on the claimant's subjective reports which have been properly discredited. *Fair*, 885 F.2d at 605; *Tonapetyan*, 242 F.3d at 1149.

In summary, the ALJ performed a reasonable evaluation of the medical evidence and his conclusion is supported by substantial evidence. The ALJ's RFC assessment reflected reasonable conclusions that could be drawn from Dr. Burke's opinion, Miletta's testimony and the record as a whole. Even if Miletta's interpretation of the record is also reasonable, the ALJ's conclusion must be sustained. *Andrews*, 53 F3d at 1039-40.

**III.**    **Adequacy of the Vocational Evidence**

The ALJ found Miletta unable to perform her past relevant work and properly proceeded to step five of the sequential evaluation process.  At step five, the Commissioner must show that the claimant can do other work which exists in the national economy.  *Andrews v. Shalala*, 53 F.3d at 1043.  The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert with a hypothetical question that sets forth all the limitations of the claimant.  *Id.*  The assumptions in the hypothetical question must be supported by substantial evidence.  *Id.*

Miletta raises three objections to the ALJ's findings in step five.  First, she alleges that the hypothetical question did not reflect all of the impairments shown by her testimony and the medical source statements of Dr. Burke.  This contention cannot be sustained because the ALJ properly evaluated that evidence and reached an RFC assessment that reflected the limitations it reasonably supported.  He elicited testimony from the VE with a hypothetical question that included all the limitations in his RFC assessment.

Second, Miletta objects to the VE's testimony that she can perform the semi-skilled occupation of gate guard.  She argues that the ALJ failed to identify transferrable skills acquired in her past work experience that would enable her to do that job.

For information about the requirements of work, the Commissioner relies primarily on the Department of Labor publication *Dictionary of Occupational Titles* (DOT).  20 C.F.R. Part 404, Subpart P, Appendix 2 § 200.00(b); *see also* SSR 00-4p.  A vocational expert may be used to provide more specific information about the requirements of a particular job as it is performed in a particular setting.  SSR 00-4p.

The DOT job descriptions include the Specific Vocational Preparation (SVP) required for each occupation. The SVP is defined as the lapsed time required for a typical worker to learn the techniques and acquire the information needed for average performance in a job. DOT, Appendix C, *available at* http://www.occupationalinfo.org/appendxc_1.html#III. An SVP of 2 indicates that the job can be learned within one month and an SVP of 3 indicates that learning the job would require more than one month, but less than three. *Id.*

Generally, an occupation is unskilled if a typical worker can learn to do it in 30 days or less. 20 C.F.R. § 404.1568(a); SSR 82-41. Consistent with this, unskilled work corresponds to an SVP of 2 and semi-skilled work corresponds to an SVP of 3. SSR 00-4p.

According to the DOT, the occupation of gate guard has an SVP of 3, making it a semi-skilled occupation. However, the VE testified that she had conducted a labor market survey and determined that the job was "entry level" and could be learned "within one month." Tr. 539.

If testimony provided by a VE is inconsistent with DOT work requirement information, the ALJ must resolve the conflict before relying on the testimony to find that a claimant is not disabled. SSR 00-4p. An ALJ may rely on expert testimony which contradicts the DOT if the record contains persuasive evidence to support the deviation. *Johnson v. Shalala*, 60 F3d 1428, 1435 (9th Cir 1995). The VE's testimony based on her labor market survey is sufficient to support the conclusion that, although designated a semi-skilled job in the DOT, the gate guard occupation can be learned by a typical worker in one month and is an entry level job. Accordingly, the ALJ did not need to identify transferrable skills Miletta acquired in her past relevant work to show that she could work as a gate guard.

Third, Miletta contends that the three occupations identified by the VE require abilities that exceed the limitations in the ALJ's vocational hypothetical question. The ALJ elicited testimony from the VE with a question that included the following hypothetical limitations:

> I want you to limit your consideration of occupations to those that are pretty much simple and repetitive, one, two, three-step occupations that, that are easy to understand from simple written instructions, or demonstration, but nothing more detailed, or complex, than that.

Tr. 538.

Miletta summarily states that the occupations identified by the VE involve more than the three steps specified in the ALJ's hypothetical question. She apparently relies on the DOT job descriptions for the three occupations. The DOT job descriptions indicate that these jobs might encompass a variety of tasks, but none that are clearly more complex than contemplated in the ALJ's hypothetical. *See* DOT 211.467-030, 211.462-010, 372.667-030, *available at* www.occupationalinfo.org/21/211467030.html, www.occupationalinfo.org/21/211462010, www.occupationalinfo.org/37/372667030.htm.

In summary, Miletta has not presented any basis for rejecting the vocational testimony.

## IV.    <u>Previous Application</u>

Miletta filed a previous application for DIB based on the same impairments, which the Commissioner denied. Within four years of the denial, Miletta made a request to reopen that claim, but the Commissioner declined to do so. The Commissioner may reopen a determination within four years of the initial determination if she finds "good cause." 20 C.F.R. § 404.988(b). Miletta asserts that she has good cause because she furnished new and material evidence in accordance with 20 C.F.R. § 404.989(a)(1).

The Social Security Act does not authorize judicial review of an alleged abuse of agency discretion in refusing to reopen a prior final decision on a claim for social security benefits. *Califano v. Sanders*, 430 U.S. 99, 107-08 (1977). The court has jurisdiction only in rare instances in which the Commissioner's refusal to reopen a prior final decision is challenged on constitutional grounds. *Id.* at 109; *Rolen v. Barnhart*, 273 F.3d 1189, 1191 (9th Cir. 2001), *cert. denied,* 537 U.S. 818 (2002); *Udd v. Massanari*, 245 F.3d 1096, 1098-99 (9th Cir. 2001).

Miletta's contention that she furnished new and material evidence does not present a constitutional challenge to the Commissioner's refusal to reopen the prior final decision. Accordingly, this court lacks jurisdiction to address that claim.

## RECOMMENDATION

Based on the foregoing, the Commissioner's determination that Miletta does not suffer from a disability and is not entitled to DIB benefits under the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's final decision should be AFFIRMED. The court lacks jurisdiction to review the Commissioner's refusal to reopen Miletta's prior application for benefits. The case should be DISMISSED.

**<u>SCHEDULING ORDER</u>**

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due December 30, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

A party may respond to another party's objections not later than January 13, 2006. If objections are filed, review of the Findings and Recommendation will go under advisement on January 13, 2006.

IT IS SO ORDERED.

DATED this <u>15th</u> day of December, 2005.

<u>/s/ Dennis James Hubel</u>
Dennis J. Hubel
United States Magistrate Judge